RECEIVED
SDNY PRO SE OFFICE

2023 AUG -3  AM 11: 03

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Joshua Olin Madson

Write the full name of each plaintiff.

23 - CV - 1482 (LTS)
(Include case number if one has been
assigned)

-against-

Do you want a jury trial?
☑ Yes  ☐ No

American International Group, Inc, (AIG)

Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

## AMENDED

## EMPLOYMENT DISCRIMINATION COMPLAINT

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with
the court should therefore *not* contain: an individual's full social security number or full birth
date; the full name of a person known to be a minor; or a complete financial account number. A
filing may include *only*: the last four digits of a social security number; the year of an individual's
birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule
of Civil Procedure 5.2.

Rev. 1/24/17

## I.    PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| | | |
|---|---|---|
| Joshua | O. | Madson |
| First Name | Middle Initial | Last Name |

PO Box 1277

Street Address

| | | |
|---|---|---|
| New York, New York | NY | 10276-1277 |
| County, City | State | Zip Code |

| | |
|---|---|
| +1 917-720-3846 | joshmadson@gmail.com |
| Telephone Number | Email Address (if available) |

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:

Lucy Fato

Name

1271 Avenue of the Americas

Address where defendant may be served

| | | |
|---|---|---|
| New York, New York | NY | 10020 |
| County, City | State | Zip Code |

Defendant 2:

Peter Zaffino

Name

1271 Avenue of the Americas

Address where defendant may be served

| | | |
|---|---|---|
| New York, New York | NY | 10020 |
| County, City | State | Zip Code |

Defendant 3:

| | |
|---|---|
| Name | |

Address where defendant may be served

| County, City | State | Zip Code |
|---|---|---|

## II.    PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

*Validus Research*

Name

*4 WTC 150 Greenwich St., 47 Floor, New York*

Address

| *New York, New York* | *NY* | *10007* |
|---|---|---|
| County, City | State | Zip Code |

## III.    CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☐    **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☑  race:                  *Jewish*

☐  color:               _____

☑  religion:          *Islam*

☐  sex:                   _____

☐  national origin:  _____

☑ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

　　My race is: *Jewish*

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

　　I was born in the year: _____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

　　My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

　　My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

B. **Other Claims**

In addition to my federal claims listed above, I assert claims under:

☑ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☑ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_____

## IV.    STATEMENT OF CLAIM

### A.    Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐ did not hire me
- ☑ terminated my employment
- ☐ did not promote me
- ☐ did not accommodate my disability
- ☑ provided me with terms and conditions of employment different from those of similar employees
- ☐ retaliated against me
- ☑ harassed me or created a hostile work environment
- ☑ other (specify):    Conspired to Assassinate Plaintiff

### B.    Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

*Please see appended Facts supporting Plaintiff's claim at the end of this amended complaint*

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V.    ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☑ Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?    *9/29/2022*

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☐ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?    _____

When did you receive the Notice?    _____

☑ No

## VI.    RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☐ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☑ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

*make payment of money damages to Plaintiff in the amount of USD $50,000,000*

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 8/1/2023 | | |
| --- | --- | --- |
| Dated | | Plaintiff's Signature |
| Joshua | O. | Madson |
| First Name | Middle Initial | Last Name |
| PO Box 1277 | | |
| Street Address | | |
| New York, New York | NY | 10276-1277 |
| County, City | State | Zip Code |
| +1 917-720-3846 | | joshmadson@gmail.com |
| Telephone Number | | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes    ☐ No

If you do consent to receive documents electronically, submit the completed form with your
complaint. If you do not consent, please do not attach the form.

**United States District Court**
**Southern District of New York**

# Pro Se (Nonprisoner) Consent to Receive Documents Electronically

Parties who are not represented by an attorney and are not currently incarcerated may choose to receive documents in their cases electronically (by e-mail) instead of by regular mail. Receiving documents by regular mail is still an option, but if you would rather receive them only electronically, you must do the following:

1. Sign up for a PACER login and password by contacting PACER[1] at www.pacer.uscourts.gov or 1-800-676-6856;

2. Complete and sign this form.

If you consent to receive documents electronically, you will receive a Notice of Electronic Filing by e-mail each time a document is filed in your case. After receiving the notice, you are permitted one "free look" at the document by clicking on the hyperlinked document number in the e-mail.[2] Once you click the hyperlink and access the document, you may not be able to access the document for free again. After 15 days, the hyperlink will no longer provide free access. Any time that the hyperlink is accessed after the first "free look" or the 15 days, you will be asked for a PACER login and may be charged to view the document. For this reason, *you should print or save the document during the "free look" to avoid future charges.*

## IMPORTANT NOTICE

Under Rule 5 of the Federal Rules of Civil Procedure, Local Civil Rule 5.2, and the Court's Electronic Case Filing Rules & Instructions, documents may be served by electronic means. If you register for electronic service:

1. You will no longer receive documents in the mail;

2. If you do not view and download your documents during your "free look" and within 15 days of when the court sends the e-mail notice, you will be charged for looking at the documents;

3. This service does *not* allow you to electronically file your documents;

4. It will be your duty to regularly review the docket sheet of the case.[3]

---

[1] Public Access to Court Electronic Records (PACER) (www.pacer.uscourts.gov) is an electronic public access service that allows users to obtain case and docket information from federal appellate, district, and bankruptcy courts, and the PACER Case Locator over the internet.

[2] You must review the Court's actual order, decree, or judgment and not rely on the description in the email notice alone. *See* ECF Rule 4.3

[3] The docket sheet is the official record of all filings in a case. You can view the docket sheet, including images of electronically filed documents, using PACER or you can use one of the public access computers available in the Clerk's Office at the Court.

# CONSENT TO ELECTRONIC SERVICE

I hereby consent to receive electronic service of notices and documents in my case(s) listed below. I affirm that:

1. I have regular access to my e-mail account and to the internet and will check regularly for Notices of Electronic Filing;

2. I have established a PACER account;

3. I understand that electronic service is service under Rule 5 of the Federal Rules of Civil Procedure and Rule 5.2 of the Local Civil Rules, and that I will no longer receive paper copies of case filings, including motions, decisions, orders, and other documents;

4. I will promptly notify the Court if there is any change in my personal data, such as name, address, or e-mail address, or if I wish to cancel this consent to electronic service;

5. I understand that I must regularly review the docket sheet of my case so that I do not miss a filing; and

6. I understand that this consent applies only to the cases listed below and that if I file additional cases in which I would like to receive electronic service of notices of documents, I must file consent forms for those cases.

**Civil case(s) filed in the Southern District of New York:**

**Note:** This consent will apply to all cases that you have filed in this court, so please list all of your pending and terminated cases. For each case, include the case name and docket number (for example, John Doe v. New City, 10-CV-01234).

1:23-cv-1482

1:23-cv-04873

Madson, Joshua, O
Name (Last, First, MI)

| | | | |
|---|---|---|---|
| PO Box 1277 | New York | NY | 10276-1277 |
| Address | City | State | Zip Code |

+1 917-720-3846                    joshmadson@gmail.com

Telephone Number                   E-mail Address

8/1/2023
Date                               Signature

**Return completed form to:**

Pro Se Intake Unit (Room 200)
500 Pearl Street
New York, NY 10007

 Gmail

## EEOC Filing (New York Office)

**Joshua Madson** <joshmadson@gmail.com>                    Thu, Sep 29, 2022 at 2:44 PM
To: info@eeoc.gov

Hello-

I'm attempting to file EEOC charges in New York.

Basis of Discrimination

-National Origin
-Religion

Adverse Action(s)

-termination based on religion
-discrimination and harassment based on race
-denial of unemployment based on race and religion
-denial of severance based on race and religion

Additional Information

-Age: 34
-Disability: no
-Hispanic or Lation: no
-National Origin or Ancestry: Other Middle Eastern
-Race: White
-Sex: Male

Please advise regarding an intake interview.

Regards,
Josh

---

**3 attachments**

**2022-09-29_13-58-27.png**
40K



**2022-09-29_14-03-57.png**
60K

**2022-09-29_13-54-12.png**
9K

## Claim to Money Damages: Title VII of the Civil Rights Act of 1964

**Facts:**

Having secured an offer of employment from Validus America, Inc., on June 20th of 2019, plaintiff Joshua Olin Madson moved from Aon Benfield, the world's largest reinsurance intermediary, to Validus Research, the research and development arm of Validus Re, a well-known and established reinsurance carrier recently acquired by AIG. As defendant in the aforementioned matter, AIG sought plaintiff's expertise in risk pricing for its subsidiary companies' inward reinsurance portfolios including specialty risks assumed by Validus Re and ILS fund manager AlphaCat. AIG further solicited plaintiff's experience in portfolio modeling and budget planning for General Insurance subsidiary Crop Risk Services, an Approved Insurance Provider in the U.S. Federal Multi-Peril Crop Insurance Program. Upon accepting the offer of employment from Validus, various actors at the aforementioned companies (1) propagated a culture of bullying and harassment based on race-religion at the company's Chicago, Decatur, and New York offices, (2) terminated plaintiff's employment based on race-religion, (3) denied severance to plaintiff based on race-religion, and (4) conspired with domestic special interest groups in plaintiff's attempted assassination based on race-religion and out of concern for the implications of his intent to bring a new reinsurance carrier to market. Plaintiff is an ethnically Jewish practicing Muslim.

Plaintiff's employment by Validus Americas Inc., and subsequently by AIG, was part of a well-coordinated and long-envisioned attempt to block a multinational conglomerate (Molto Publishing) from establishing itself in New York. The business plans for Molto Publishing were developed in the early 2000's at the Singapore American School through direct collaboration between established members of the Singapore government, agents of the United States government, faculty at the Singapore American School, and business executives participating in the global reinsurance and capital markets. AIG's ultimate responsibility for plaintiff's attempted assassination by domestic special interest groups at the behest of the political authority wielded by both Lucy Fato (General Counsel, AIG) and Peter Zaffino (Chairman and CEO, AIG), form the legal basis for money damages sought. In the damning evidence attached herewith, AIG Head of Security, Marisa Colon, was added by opposition counsel to the petitioner's witness list in plaintiff's divorce from a family tied to domestic and international terrorist organizations in the Chicagoland area (see **Exhibit 1**). This action, among other written and verbal communication, provides direct evidence of the company's attempt to have plaintiff assassinated following a three-month period of torture and detention beginning in October of 2020.

The AIG company representative's collaboration with plaintiff's ex-wife and her attorneys ties the firm to a broader conspiracy to assassinate plaintiff utilizing a network of connected family law offices, political operatives, and domestic intelligence and law enforcement agencies in Chicago, Texas, and New York (see **Exhibit 3-5**). The company's indiscriminate violation of Title VII protections for racial characteristics and religious beliefs forms the initial basis for the lawsuit. The physical and psychological damages associated with biological and chemical attacks carried out by employees of the company (Jeffrey Gall, COVID-19 Virus), and its affiliates in domestic intelligence and law enforcement agencies (Atascosa County Jail & San Antonio Behavioral Health Hospital, chemically enhanced torture protocol) further support the **USD $50,000,000** in monetary damages sought.

In plaintiff's assertion of his claim to money damages under Title VII of the Civil Rights Act of 1964, the following names and titles of relevant people are provided as reference to further description of all relevant events.

**Relevant People**

**Peter Zaffino** – Chairman & Chief Executive Officer of American International Group, Inc. (AIG)

**Lucy Fato** – Executive Vice President, General Counsel & Global Head of Communications and Government Affairs

**Rick Joers** – Head of Employee Relations, AIG

**Kevin Doherty** – Regional Administration Manager, General Insurance

**Marisa Colon** – Head of Security, AIG

**Kean Driscoll** – Global Chief Underwriting Officer for Property and Agriculture, General Insurance

**Jeff Clements** – Chief Underwriting Officer, Validus Re

**Kevin Downs** – Chief Actuary, Validus Re

**Helen Crisson** – Senior Vice President, Head of Reserving, Validus Re

**Simon Biggs** – Chief Executive Officer, Validus Research

**Jeffrey Gall** – Head of Research and Development, AIG

**Jason Miller** – Chief Operating Officer, Validus Research

**Melissa McDermott** – Chief Actuary for North America General Insurance, AIG

**John Raeihle** – Head of Western World Actuarial, AIG

**Brian Young** – Chief Executive Officer, Crop Risk Services

**Dawn Schuster** – Chief Financial Officer, Crop Risk Services

**Steve Maulberger** – Vice President, Crop Risk Services

**Shawn Simpsen** – Senior Vice President, Crop Risk Services

**Doug Neibuhr** – Product Manager, Crop Risk Services

**Roger Ninness** – Policy Provisions Manager, Crop Risk Services

**Kelly Gulick** – Filings and Underwriting Analyst, Crop Risk Services

**Colleen Sizemore** – Database Analyst, Crop Risk Services

## Relevant Events

1.) Please note that all relevant events noted in the facts of this complaint tie back to a corporate political plan established by AIG in the early 2000's with members of the London, Bermuda, United States, and Singapore reinsurance markets and constitute deliberate violations of plaintiff's Constitutionally established civil liberties and civil rights, as well as willful infractions of Title VII of the Civil Rights Act of 1964. The domestic and international political authority employed by Lucy Fato (General Counsel and Global Head of Communications) and Peter Zaffino (Chairman and Chief Executive Officer), in the execution of AIG 200, the company's century-long plan of operations, make the pair ultimately responsible for the actions taken at their business subsidiaries.

2.) At the insistence of executive managing directors operating from Aon Benfield's Chicago offices, plaintiff maintained a watchful eye on exit opportunities from the intermediary following the vesting of restricted stock units granted to him as compensation and retention incentive in 2016 and in 2017. While 142 (2016) of plaintiff's 338 RSU's vested in 2019, 196 (2017) of the RSU's vested proportionally over five years (see **Exhibit 2**). As pressure mounted on plaintiff to leave the firm, he conducted informal interviews with reinsurance carriers including Berkshire Hathaway and Validus Re. Following conversations with Kean Driscoll (CEO, Validus Re), Jeff Clements (CUO, Validus Re), and Simon Biggs (CEO, Validus Research), plaintiff negotiated an offer of employment from the firm. In their decision to hire away from the intermediary, the executives put in motion a series of geo-political events that led to plaintiff's torture and detention in Atascosa County, Texas.

3.) Upon accepting the offer of employment from Validus Americas (AIG Re), plaintiff commenced work in the AIG Chicago offices at 500 W Madison Street. The office administrator (Kevin Doherty) and on-site IT staff consistently disconnected the ethernet connection to plaintiff's desk, making working on-site technically infeasible. Because the comments made to plaintiff in the office regarding these timed outages included references to his religion (Islam), and his race (Jewish), plaintiff notes that these actions were directly related to characteristics protected under title VII of the Civil Rights Act of 1964.

4.) Having managed to secure a remote computing resource from the Bermuda offices of Validus Re, plaintiff was able to make progress on risk modeling deliverables to AIG, Validus Research, Validus Re, and Crop Risk Services via a combination of time spent in the AIG Chicago offices, the Crop Risk Services Decatur offices, and from his home office Desktop. Laptop computers provided to plaintiff from Crop Risk Services failed repeatedly while AIG office administrators provided and refused to allow plaintiff to use a Dell company laptop that sat on his Chicago office desk. The remote computing resource provided to plaintiff from the Bermuda offices of Validus Re was reliable enough that plaintiff was able to eye-copy source code written on his home Desktop to the Validus Re system in short sprints, allowing him to maintain his employment with the firm for his 90-day trial period. These actions were taken to undermine the reputation of plaintiff in the marketplace and decelerate his technical knowledge development, out of concern for plaintiff's personal financial resources and ability to bring Molto Publishing to market.

5.) Upon completion of initial risk modeling deliverables working directly with Simon Biggs (CEO, Validus Research), in Validus Re's Bermuda offices, plaintiff began an evaluation

of the Crop Risk Services Multi-Peril and Named-Peril crop insurance portfolios for an internal audit review conducted by executives at parent company AIG. After a discussion with Kevin Downs (Chief Actuary, Validus Re), and Helen Crisson, (Senior Vice President, Head of Reserving, Validus Re), during which Kevin intimidated and threatened plaintiff directly on a conference call, plaintiff provided named-peril pricing data to Validus Re in spite of warnings from Crop Risk Services President Brian Young to the contrary.

6.) Having communicated the computing issues at AIG and Validus Re to Brian Young (CEO, Crop Risk Services), Brian provided plaintiff with a Lenovo T-series laptop with on-board computing resources including 64 GB of RAM and ~500 GB of local storage space. Computing requirements requested for risk model development by plaintiff included database and development servers with a minimum 256GB RAM and 4 TB of local storage space. Due to concerns voiced by Brian Young regarding Jeffrey Gall's oversight of Validus Research server space, plaintiff attempted to work locally on the aforementioned Crop Risk Services machine. Met with frequent system BIOS errors, plaintiff maintained his remote computing arrangement with Validus Re Bermuda in order to meet business deadlines set by Validus Research and Validus Re Bermuda. In the context of Brian Young's introduction to Kean Driscoll, Jeff Clements, and Simon Biggs in furtherance of plaintiff's employment negotiations, the executive's actions can be attributed to the broader group's attempt to undermine his technical knowledge and reputation as an industry leader in development of risk pricing and underwriting analytics solutions for risk bearing companies in the marketplace.

7.) At the request of Jason Miller (Chief Operating Officer, Validus Research), and Jeffrey Gall (Head of R&D, AIG), plaintiff made daily visits to the Decatur, Illinois offices during AIG's internal audit of the named peril portfolio. During these visits, Doug Neibuhr (Product Manager), and Roger Ninness (Policy Provisions Manager) made frequent attempts to induce plaintiff to anxiety and/or panic attack during meetings in plaintiff's office. Because it was well-known that plaintiff exercised his right to carry a concealed firearm out of concern for his personal safety necessitated by the threatening behavior of colleagues in the workplace, these attempts to unsettle plaintiff were politically motivated and intended to cause a psychological and physical response that would erode plaintiff's reputation as a collected and law-abiding citizen.

8.) Plaintiff's business relationship with direct manager Jeffrey Gall became strained as he met business requirements set forth by Crop Risk Services and AIG General Insurance. His frequent visits with executives in Decatur, Illinois and budget planning conversations with AIG's chief actuaries threatened Gall's position as head of research and development with the firm. Plaintiff noted Jeffrey's attempts to have his position terminated to Kean Driscoll and other members of the AIG executive leadership team and was able to secure a joint reporting structure with Jason Miller and Jeffery Gall as co-managers. As a direct acknowledgement of plaintiff's contributions to the firm's underwriting capabilities, AIG and Validus executives moved the pricing model for the assumed reinsurance portfolio of agriculture business and primary CRS book to a 'critical' designation and plaintiff began documentation of his work to meet the requirements of the Swiss regulator (FINMA). Jeffrey's threatening behavior on phone calls and video conferences culminated in September of 2020 when he directly accosted plaintiff over his religious beliefs (Islam) (see **Exhibit 6**).

9.) Out of his concerns for his personal safety in the run-up to the assassination attempt made by domestic intelligence and law-enforcement agencies in October of 2020, plaintiff made attempts to secure office space with Validus Re in Hamilton, Bermuda, away from his primary residence in Lake Forest, Illinois.  Of particular concern to plaintiff were his ex-wife's ties to members of a domestic terror organization, including colleagues at PURE Group of Insurance Companies, a client of Validus Re. Conversations with Pat Boisvert, the Chief Financial Officer at Validus Re, and other members of the administrative staff on the island were initially positive, and included emails and conference calls on the subject of an executive apartment in Hamilton.  Soon after Jeffery Gall became involved in the conversation regarding plaintiff's relocation, Simon Biggs (CEO, Validus Research), reversed his initial position on the move. Simon's comments on the matter included quips including "…[Bermuda immigration] might not be as aware of that as they should be…but in any event, that might have been very bad for us" and emails that began to obfuscate the positions of the parties involved in relocation planning, while Jeffrey Gall stated "it looks like you've reached the end of the road."

10.) As the date of the assassination attempt grew nearer, communication from the Crop Risk Services Decatur office became increasingly difficult to understand.  Phone conferences with executive leadership at the business unit were consistently filled with obfuscation and seemingly meaningless conversation, with consistent innuendo targeting plaintiff's religious beliefs and family arrangements.  His ex-wife's religious beliefs and her ethnic origin/race (Bangladesh) were frequently highlighted during business meetings.  Dawn Schuster (Chief Financial Officer, CRS), Shawn Simpsen (SVP Product, CRS), Steve Maulberger (VP Integration, CRS), and Kelly Gulick (Filings and Underwriting Analyst, CRS), all made disparaging comments regarding these protected characteristics and beliefs included in the attached exhibits (see **Exhibits 8, 10, and 11**).

11.) Of particular note, at the outset of the domestic agency operation intended to end with plaintiff's death by suicide or in a violent confrontation with law enforcement and/or intelligence agents along the route from Lake Forest, Illinois, to Corpus Christi, Texas, plaintiff attempted to secure lodging in Decatur, Illinois at a number of hotels that he frequented regularly while at AIG.  In each instance where plaintiff attempted to secure accommodations, the desk clerks at the aforementioned hotels verbally threatened him and indicated it was not safe for him to stay for the evening.  Because plaintiff had often made hotel bookings at the Holiday Inn & Suites Decatur-Forsyth at the AIG corporate rate while using their on-line booking system, plaintiff notes that the behavior and interactions with hotel staff can be directly attributed to the political authority wielded by Lucy Fato (General Counsel, AIG) and Peter Zaffino (Chairman and CEO, AIG) in their generations long plan to remove plaintiff from the domestic political and business arena.

12.) The initial attempt to assassinate plaintiff failed between the outset of the operation on the 16th of October, 2020, his chemically enhanced torture in the Atascosa County Jail from October 18th, 2020 until October 23rd, 2020, and the plaintiff's detention and torture in the San Antonio Behavioral Health Hospital from October 23rd, 2020 until November 19th, 2020.  His release from the San Antonio Behavioral Health Hospital included instructions to return to his Lake Forest, Illinois home as an agent of the Central Intelligence Agency, corroborated by further interaction with the Lake Forest Police Department in Autumn of 2021 regarding an agency passport, driver's license, birth certificate, and social security card to replace plaintiff's originals.  Having officially taken

FMLA leave from AIG during the aforementioned events, plaintiff returned to work on January 7th, of 2021. Written statements from colleagues at AIG including John Raeihle, (Head of Western World Actuarial, AIG) included innuendo regarding having been 'made', a reference to plaintiff's preference to carry a concealed firearm, and 'bullets' intended to increase plaintiff's levels of fear and anxiety regarding the ongoing security environment (see **Exhibit 7**).

13.)        Following plaintiff's return to work, various actions and comments from colleagues at Crop Risk Services and AIG made reference to his detention in the aforementioned Texas facilities. Because plaintiff made the proper formal arrangements to take FMLA leave from the firm during his detention in both facilities, the direct communications regarding the events constitute violations of section 105 of the Family and Medical Leave Act which prohibits discriminating or retaliating against an employee for having exercised or attempted to exercise any FMLA right. In consideration of the circumstances requiring plaintiff's arrangement for FMLA leave, these actions also constitute retaliation under Title VII protected characteristics including race and religion (see **Exhibit 12**).

14.)        Plaintiff's final discussions with John Raeihle (Head of Western World Actuarial, AIG), and Melissa McDermott (Chief Actuary for North America, General Insurance), in August of 2021 included similar innuendo including sexual harassment promulgated by McDermott on previous conference calls where she referred to being "all messy" and "needing to clean her bedroom". These comments by McDermott were previously established by AIG in the early 2000's and are an attempt to reinforce the inculpability of senior executives in the context of business discussions with junior peers based on sex as opposed to other Title VII categories of discrimination including religion, race, color, or national origin (see **Exhibit 9**).

15.)        In February of 2022, plaintiff departed his Lake Forest, Illinois home and sought political asylum in New York, as family law offices and the 19th circuit court turned against him during the course of his divorce proceedings. Having previously discussed working from the Validus Re offices in New York, he made his direct managers Jeffrey Gall (Head of R&D, AIG), and Jason Miller (Chief Operating Officer, Validus Research) aware of his plans to move. On his flight to Newark Airport, he was escorted by agents of the Central Intelligence Agency and other domestic intelligence agencies after which he took part in an operation at Newark International Airport. The operation concluded with a transfer from the plaintiff's temporary accommodations at the Springhill Suites and the Fairfield Inn & Suites to the Manhattan based Hilton Garden Inn. Because of ongoing security concerns at the Hilton Garden Inn, plaintiff moved to the City Club Hotel, and finally the Royalton Hotel, in quick succession. Threats to plaintiff's personal safety were made on the basis of race-religion, and on his arrival at the Royalton hotel, Rick Joers (Head of Employee Relations), terminated him for job abandonment in spite of his continuous communications with managers regarding his ongoing relocation (see **Exhibit 14**). Because AIG's decision to terminate was made in spite of plaintiff meeting the firm's deadlines and requirements for maintaining his position, (see **Exhibit 13**) and in light of their decision to have a Muslim employee deliver the letter of termination to the plaintiff at the Royalton hotel, plaintiff notes that the adverse employment decision was made on the basis of protected Title VII characteristics (race (Jewish), and religion (Muslim). Plaintiff was terminated without 90 days severance, the minimum industry standard severance for executives departing Bermudian and domestically domiciled reinsurance carriers.

## Exhibit 1

      (2) Joshua Madson
      a/k/a Abd-Al Rahman & Rahman San
      280 E. 2nd Stret, Unit 3F
      New York, New York 10009
      joshmadson@gmail.com

Subject Matter: It is anticipated that Joshua will be called as an adverse witness pursuant to 735 ILCS 5/2-1102. It is anticipated that Joshua will testify as to matters relating to the facts and opinions regarding: the parties' relative financial and non-financial contributions during the marriage; Joshua's spending since the parties have separated; the Respondent and Petitioner's earnings; the Respondent's employment; the Petitioner's employment; both parties ability to acquire assets and earn an income; the current assets and liabilities in his control and the values thereof; his educational background and work history, including his sources of income; his personal relationships and living arrangements since the parties separated; and his criminal history including but not limited to arrests in Texas and New Jersey. It is further anticipated that Joshua will be called as a witness for purposes of authenticating records and documents which relate to any issue(s) in this litigation. Joshua will also testify as to any and all allegations contained in any of Joshua or Runia's pleadings and on other areas and facts which may be necessary to answer or rebut any issues raised by Joshua. Joshua will also be called to testify regarding any social media post, email or any other written documentation made by his aliases, Rahman San and/or Abd-Al Rahman. Joshua will also be called to testify as to any and all facts and matter that are relevant to the factors set forth in Sections 501, 503, 504, 505.1, 508 and any other applicable provision of the Illinois Marriage and Dissolution of Marriage Act and 750 ILCS 60/et seq. and all relevant sections of the Illinois Domestic Violence Act.

      (3) Marisa Colon – *Head of Security - AIG*
      28 Liberty Street
      46th & 47th Floor
      New York, NY 10005

Subject Matter: Ms. Colon will be called to authenticate documents. Ms. Colon may be called to testify regarding her interactions with Joshua and Runia during the pendency of this case. Ms. Colon may testify regarding her experiences with Joshua and Runia and steps taken to ensure safety at AIG in her role as Head of Security. Ms. Colon may also be called to testify as to any and all facts and matter that are relevant to the factors set forth in Sections 501, 503, 504, 505.1, 508 and any other applicable provision of the Illinois Marriage and Dissolution of Marriage Act and 750 ILCS 60/et seq. and all relevant sections of the Illinois Domestic Violence Act.

      (4) Lara Tristan
      1405 Campbell Ave, Suite 102
      Jourdanton, TX 78026

Subject Matter: Ms. Tristan will be called to authenticate documents. Ms. Tristan may be called to testify regarding her interactions with Joshua as his probation officer. Ms. Tristan may testify regarding her experiences with Joshua and Runia and any violations of probation, pending charges,

2

**Exhibit 2**

### RESTRICTED STOCK UNIT AGREEMENT
### UNDER AMENDED AND RESTATED
### AON PLC 2011 INCENTIVE PLAN

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and JOSHUA  MADSON (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1.  **Grant of Restricted Stock Units.**   The Company grants under the Plan an award of _____142_____ RSUs on 05/20/2016 (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2.  **Vesting of Restricted Stock Units.**  The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3.  **Tax Withholding Obligations.**   The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

    a)  Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

        (i)     withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

        (ii)    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

        (iii)   withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of

- 1 -

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and _____**JOSHUA MADSON**_____ (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of ____**196**____ RSUs on **05/19/2017** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i)   withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

      (ii)  withholding in Shares to be issued upon vesting/settlement of the RSUs; or

      (iii) withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

- 1 -

**Exhibit 3**

## WARRANT OF APPREHENSION AND DETENTION

TO ANY PEACE OFFICER OF THE STATE OF TEXAS, GREETINGS: You are hereby commanded to

apprehend and detain ___Joshua Madson___ and immediately transport him/her to

___San Antonio Behav. Hosp.___ for a preliminary examination in accordance with

TEXAS MENTAL HEALTH CODE Sec, S73.012.

Herein Fail Not and of this writ due return showing how you have executed the same.

Witness my official signature, this _23_ day of _October_, 20 _20_.

_____
JUDGE
COUNTY COURT
___Harcosa___ County, Texas

OFFICER'S RETURN

Came to hand on the ____ day of _____, 20___ and executed on the ____ day of

_____, 20 ___ by _____

_____, Peace Officer

_____, County, Texas

BY: _____

Cause No. _____

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE COUNTY COURT |
| FOR THE BEST INTEREST | § | |
| AND PROTECTION OF | § | Abarrra COUNTY, TEXAS |
| J.M (Initials Only) | § | |
| | § | |

## APPLICATION FOR EMERGENCY DETENTION

Date 10-23-2020

Name of Applicant Caminoreal Community Services

Address 19971 FM 3443 N. Lytle, H
                   78052           Phone#: Home _____

                                              Work 810-246-3300

                                              Ext. # _____

Name of Person for whom Commitment is sought: Joshua Madson

Address (Residence)
16803 Ridge Rd Lake Forest, IL 60045

Race W    Sex M    Age 32

Relationship of Applicant to Person for whom Commitment is sought:

_____ Stranger    _____ Spouse    _____ Neighbor

_____ Friend    _____ Former Spouse    Other ✓

I have reason to believe and do believe that Joshua Madson is
mentally ill and that unless he/she is immediately restrained there is an imminent
substantial risk of serious harm to himself/herself or others, said harm being described
as: Joshua believes there is alturnative language
he believes his father-in-law is terrorist He
is not eating, sleeping and not able to focus.
He had a AR gun with two hand guns in his

My beliefs are based on the following specific recent behavior, over acts, attempts or threats: He reported that his father in law muslim is involved with 911 injected him with a virus that is the reason he is feeling cold. He drove 1300 miles to get away from terrorist

By way of further information I offer the following: with out hospitalization he poses a danger to self and others Joshua with paranoia that everyone is listening to him and watching him Joshua has a non existent short term memory

Aileen Cardenas QMHP
Applicant

Sworn to and Subscribed before me, this _23_ day of _October_ A.D., 20 _20_

_____
Notary Public, State of Texas

Robert C. Hurley
Judge

County Court
Atascosa County, Texas

_____
Printed Name

My Commission Expires: _____

**Exhibit 4**

CAUSE NO. 2020MH2350

THE STATE OF TEXAS
FOR THE BEST INTEREST
AND PROTECTION OF J.M.
AS A MENTALLY ILL PERSON

PROBATE COURT NO. 1
BEXAR COUNTY, TEXAS

## JUDGEMENT: COURT-ORDERED TEMPORARY MENTAL HEALTH SERVICES

On this _3rd_ day of _November, 2020_, came to be heard the Application for Temporary Commitment for Mental Illness in the above numbered and entitled cause. No jury having been demanded, and _MENTAL HEALTH PUBLIC DEFENDER_, attorney for _JOSHUA MADISON_ (hereinafter referred to as 'Patient'), and the State having appeared and announced ready, all matters of fact and law were submitted to the Court.

The Court finds that all necessary parties have been served with a copy of ~~said Application and written notice of the time and place of this hearing.~~

The Court further finds that _Dr. EDULFO GONZALES, M.D., and_ Dr. _D. Listonarion_____, M.D., both duly licensed to practice medicine in the State of Texas or employed by an agency of the United States having a license to practice medicine in any state of the United States, timely filed in this cause Certificate(s) of Medical Examination for Mental Illness stating that Patient is mentally ill, and that said Certificate(s) are in compliance with the Texas Mental Health and Safety Code.

The Court finds that all terms and provisions of the Texas Mental Health and Safety Code have been complied with and after considering all of the evidence and testimony and Certificate(s) filed herein, the Court finds that the facts alleged in the Application are true and correct.

Accordingly, the Court finds that the Patient is mentally ill and that as a result of that mental illness the Patient:

- [ ] is likely to cause serious harm to self;
- [x] is likely to cause serious harm to others.
- [ ] is suffering severe and abnormal mental, emotional or physical distress; is experiencing substantial mental or physical deterioration of his ability to function independently, which is exhibited by the proposed patient's inability,except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and unable to make a rational and informed decision as to whether or not to submit to treatment.

- [ ] The Court finds that:
- [ ] the Patient is liable for costs;
- [x] the cost relate to services provided or to be provided in a private mental hospital _constant care_; therefore, the person executing the application _EGospania uarion_ for services provided or to be provided in a private facility is liable for costs;

- [ ] _____ is the person or estate liable for the patient's support in a departmental mental health facility; therefore, said person or estate is liable for costs.

- [ ] _____ County initiated the original Order For Protective Custody and is, therefore, liable for court costs.
- [ ] An Affidavit of Inability to Pay Court Costs has been filed; therefore, court costs should be waived.
- [ ] An inability to pay or indigency has been shown; therefore, court costs should be waived.

(ATM806)

SABH

CAUSE NO. 2020MH2405

| THE STATE OF TEXAS | PROBATE COURT NO. 1 |
|---|---|
| FOR THE BEST INTEREST | BEXAR COUNTY, TEXAS |
| AND PROTECTION OF <u>J.M.</u> | |
| AS A MENTALLY ILL PERSON | |

## ORDER TO COMPEL PSYCHOACTIVE MEDICATIONS

On this the <u>3rd</u> day of <u>November</u>, <u>2020</u>, came to be heard the Petition of <u>Edulfo Gonzalez-Sanchoz M</u>, for Order to Compel Psychoactive Medications in the above numbered and entitled cause, Attorney for <u>Joshua Madison Aka Joshua Madson</u> (hereinafter referred to as "Patient") and the State having appeared and announced ready, all matters of fact and law were submitted to the Court.

The Court finds that all necessary parties have been served with a copy of said petition as required by law and written notice of the time and place of this hearing.

The Court finds that all terms and provisions of the Texas Health & Safety Code have been complied with and after considering all of the evidence and testimony presented, the Court finds that the facts alleged in the Petition are true and correct and supported by clear and convincing evidence.

The Court finds (I) that on file in this cause is a signed and sworn Petition by the Patient's physician who has examined the Patient and that such Petition meets all the terms and requirements of the Texas Health & Safety Code, (II) the Patient is in need of psychoactive medication and is lacking in the capacity to make a decision regarding the administration of the medications, (III) the medication is in the proper course of treatment and in the best interest of the Patient, and (IV) the Patient is currently under court ordered temporary mental health services issued under section 574.034 or extended mental health services issued under Section 574.035 and is refusing to take the medication voluntarily.

THEREFORE IT IS ORDERED, ADJUDGED AND DECREED pursuant to Texas Health & Safety Code Section 574.106, that applicant facility or the Texas Department of State Health Services, by and through its agents, is authorized to administer to the Patient, regardless of the Patient's refusal, the following class(es) of psychoactive medication:

☐ antidepressants    ☐ monoamine oxidase inhibitors    ☐ stimulants
☑ antipsychotics    ☑ mood stabilizers    ☑ anxiolytics/sedatives/hypnotics

It is also ORDERED, ADJUDGED AND DECREED that during the period this Order is valid, the dosage of the herein authorized class(es) of psychoactive medication can be increased or decreased, and restitution of medication authorized but discontinued and the substitution of a medication within the same class is permitted.

This Order expires upon the expiration or termination of the court ordered temporary or extended mental health commitment.

It is further ORDERED that <u>Mental Health Public Defender</u>, attorney appointed by the Court to represent Patient, be and is hereby allowed the reasonable compensation for attorney's fees in this Cause, said compensation shall be taxed as costs.

All costs of this proceeding are hereby ☑ taxed __ waived against the patient herein for which Execution ☑ may ☐ shall not, issue.

SIGNED AND DATED this the <u>3rd</u> day of <u>2020</u>
NOV

David L. McLane
E-signed 2020-11-03 10:15AM GST
probatemhjudge@bexar.org

David L. McLane (Nov 3, 2020 10:15 CST)
Oscar Kazen, Judge
Probate Court No. 1

SABH

CAUSE NO. 2020MH2360

## ORDER

IT IS ORDERED, ADJUDGED AND DECREED that the patient is hereby committed for Court-ordered Temporary Mental Health Services to H A BEHAVIORAL HOSPITAL for:

[✓] Inpatient  [ ] Outpatient Mental Health Services not to exceed
[✓] Fourty-five (45) days;
OR
[ ] Ninety (90) days; the court having found that the longer period is necessary.

IT IS FURTHERED ORDERED that the Clerk of this Court issue a Writ of Commitment in duplicate to the Sheriff of Bexar County, Texas, authorizing and commanding said Sheriff to take charge of Patient and to transport Patient to the above designated In-Patient mental health facility.

The head of the above named In-Patient mental health facility, upon receiving a copy of the Writ of Commitment and having admitted Patient, shall give the person transporting Patient a written statement acknowledging acceptance of Patient and any personal property belonging to Patient and shall file a copy of such statement with the Clerk of this Court.

The Clerk of this Court is furthered ordered to prepare a certified transcript of the proceedings in this cause and send it to the head of the hospital to which Patient is committed.

IT IS FURTHERED ORDERED that MENTAL HEALTH PUBLIC DEFENDER attorney, appointed by the Court to represent Patient, be and is hereby [✓] allowed [ ] denied the reasonable compensation for attorney's fees in this cause. Said compensation [✓] shall be taxed as costs, [ ] shall be waived.

IT IS FURTHERED ORDERED that all costs of these proceedings are hereby taxed against:

[ ] the Patient is liable for costs of which execution may issue;

[✓] the cost relate to services provided or to be provided in a private mental health hospital San Antonio Behav; therefore, the person executing the application, Esperanza Garibay , for services provided or to be provided in a private facility is liable for costs for which execution may issue;

[ ] _____ is the person or estate liable for the patient's support in a departmental mental health facility; therefore, said person or estate is liable for costs for which execution may issue;

[ ] _____ County initiated the original Order For Protective Custody and is, therefore, liable for court costs for which execution may issue;

[ ] An Affidavit of Inability to Pay Court Costs has been filed; therefore, the Affidavit of Inability is approved and all costs of court are waived.

[ ] An inability to pay court costs or indigency has been shown; therefore, all costs of court are waived.


SIGNED AND ORDERED, this the 3rd day of November, 2020.


David L. McLane
E-signed 2020-11-03 10:07AM CST
probatemhjudge@bexar.org

David L. McLane (Nov 3, 2020 10:07 CST)

Oscar Kazen
Probate Court No. 1


(ATM86B)

**Exhibit 5**

Name of person receiving instructions: **Madson, Joshua**   Relationship: ☐Parent ☐Spouse ☐Partner ☑Other: **Self**

Charge status:  ☑Completed Treatment  ☐Pt Request Prior to Recommended Date  ☐Non-compliant  ☐AMA
☐Transfer/Disc to Medical Facility  ☐Trans/Disc to another Psych Facility  ☐Trans/Disc to State Facility

Will be returning to work / school?  ☐No  ☑Yes: Date of return: **TBD**  ☐N/A
Has Psychiatric Advance Directive: ☐Yes ☑No, Information given ☐Declined
Has Medical Advance Directive: ☐Yes ☑No, Information given ☐Declined

Reason for hospitalization: **Depression**

Post-discharge goal (What patient plans after discharge, stated in patients own words): **"Get a job ASAP!"**

**REFERRALS**

Substance abuse treatment offered: ☐N/A ☑See below ☐Declined   Tobacco cessation treatment offered: ☐N/A ☐See below ☐Declined

Referrals for follow up

| | Appointment date / time / type | Telephone / Fax |
|---|---|---|
| Resource **Camino Real Community Services Atascosa County MH** Address **1749 Hwy 97 East Jourdanton, TX 78026** | Date **11/19/20** Time **9:00am** Type: ☑Behavioral care ☐Addiction | Phone **830-767-2320** Fax **830-769-3538** |
| Resource _____ Address _____ | Date ___ Time ___ Type: ☐Behavioral care ☐Addiction | Phone ___ Fax ___ |
| Resource _____ Address _____ | Date ___ Time ___ Type: ☐Behavioral care ☐Addiction | Phone ___ Fax ___ |

Other instructions: The patient is to follow up with The Center for Health Care Services    *Camino Real Community Services, TX*

MISSING APPOINTMENTS    *If you are unable to keep your appointment, please call the appointment location at least 24 hours in advance, if possible, so you can reschedule. It is important that you maintain contact with your physician(s) and/or therapist after discharge.*

**TRANSPORTATION PLAN**

Name of person transporting patient: **Atascosa County Sheriff's Office**   Relationship: ☐Parent ☐Spouse ☐Partner ☑Other: _____

Planned time of transport? **1:00pm**

Destination:
☐Home: _____
☑Facility: **Atascosa County Sheriff's Office 1108 Campbell Ave, Jourdanton, TX 78026** ☐HHA ☐SNF ☐IRF ☐LTCH **(830) 769-3434**

* If discharged to a home health agency (HHA), skilled nursing facility (SNF), inpatient rehab facility (IRF), or long-term care hospital (LTCH), the patient was provided Key Performance Data, including Quality Metrics, to assist with discharge planning process —Staff initials _____

Clinical Services Staff Signature / Title: _____   Date: **11.16.2020**   Time: **4:00pm**

**Crisis Emergency Contact Information:**
The following are Emergency Numbers I can call if I need help.
• **911**
• **Suicide Hotline 1-800-273-8255**
• **San Antonio Behavioral HealthCare Hospital 210-541-5300**
•Other:

**DISCHARGE/AFTERCARE PLAN**
San Antonio Behavioral Healthcare Hospital

Name: Madson, Joshua
Adnum: 2010884  DOB: 05/24/88  Age: 32
MedRec#: 0120761  Sex: M  DOA: 10/24/20
Unit: A-Monarch
Doctor:  Gonzales-Sanchez, E.

Page 1 of 2
SABHH S.002

Rev. 01.30.20

## GENERAL MEDICATION INSTRUCTIONS

Allergies: **NKDA**    Diet: ☐ Regular ☐ Other: _____    Activity: ☐ As Tolerated ☐ Other: _____

☐ Discharge Medication Reconciliation List reviewed and attached.

☐ Prescriptions provided: ☐ Yes: ☐ Prescription given to patient / guardian  ☐ Prescription called in to pharmacy
   ☐ No (explain): _____

### Medication Reminders

- DO NOT TAKE ALCOHOLIC BEVERAGES or STREET DRUGS OF ANY KIND WHILE ON MEDICATIONS
- Take medications as they are prescribed at discharge. Do not change the dose d or time, unless directed by your physician
- If you experience side effects from your medications, notify your outpatient provider or primary care physician
- For adolescents, medication should be kept out of reach and in a secure place.
- Non-compliance with medication history is a big risk factor for re-admission within 30-days
- Keep all aftercare appointments as scheduled and take a copy of the aftercare plan to your appointment

### Continuity of Lab / X-rays / Tests Results and Contact Information:

☐ There were no lab/test results pending at the time of discharge    ☐ Copies of labs / x-rays given to patient    ☐ Patient did not want copies of labs

☐ The following lab/test results were pending at the time of discharge: _____
   Please call **210-541-5300** and ask for the Nursing Supervisor if you have questions about any pending lab / test results.
☐ Medical Records Department may be reached during business hours at 210-541-5308 to obtain copies of results of pending labs/test (signed release required)
☐ In case of a medical emergency, information will be provided to medical professionals by calling 210-541-5300 and asking for the Nursing Supervisor

### Attestation Statements

☐ I do not have access to any prescription medications, drugs, alcohol or drug paraphernalia, guns, sharp utensils (i.e. kitchen, hunting and/or pocket) or any other weapons / items (i.e. razors, chemicals, etc.) that I would use with lethal intent or intent to harm self or others.
☐ I have received a copy of my Aftercare Discharge Instructions and Individual Wellness Recovery Plan and I understand the instructions provided and all my questions have been answered.
☐ I authorize the release of this Aftercare Discharge Instructions to the providers listed on the first page, to assist in continuity of care.

*I understand these records may include drug/alcohol/mental health/communicable disease-related information. I understand that information released could contain reference to results of HIV antibody testing. A photocopy of this authorization should be considered as valid as the original. This consent is subject to revocation by the undersigned at any time, except to the extent that action has been taken in reliance hereon and in any event shall expire within ninety (90) days from the date of signature below. The information being authorized to release is being disclosed to you from records protected by the Federal Confidentiality Rules (42CFR Part 2). A general authorization for the release of medical or other information is not sufficient for this purpose. The information to be released is PRIVILEGED and CONFIDENTIAL and is intended ONLY for the use of the recipient(s) named above.*

| Status at Discharge: | ☐ Verbalizes not suicidal or homicidal | ☐ Alert and oriented x4 | ☐ Other (describe): _____ |
| | ☐ Verbalized ready for discharge | ☐ Ambulatory | ☐ Needs assist (describe): _____ |
| Mode of Transport | ☐ Personal / family vehicle ☐ Taxi ☐ Bus ☐ Ambulance ☐ Hospital vehicle ☐ Other(describe): _____ | | |
| Accompanied by: | ☐ Self ☐ Parent / guardian ☐ Spouse / partner ☐ Friend ☐ Agency staff ☐ Other(describe): **Sheriff department** | | |
| | Name of above: _____ | | |

The discharge instructions (pages 1 and 2) have been explained to me and my questions have been answered. I understand and agree with the instructions.

Patient signature: _____    Date: 11/17/2020    Time: 10:00 A.M.

Parent / Legal guardian signature: _____    Date: _____    Time: _____

RN signature: _____    Date: 11/17/2020    Time: 1000

**DISCHARGE/AFTERCARE PLAN**
San Antonio Behavioral Healthcare Hospital

Page 2 of 2
SABHHS.002

Patient Identification
Name: Madson, Joshua
Adnum: 2010884  DOB: 05/24/88  Age: 32
MedRec#: 0120761  Sex: M  DOA: 10/24/20
Unit: A-Alamo
Doctor: Gonzales-Sanchez, E.

Rev. 01.30.20

### Discharge Medication Reconciliation

Discharging Nurse Lists the Medications the Patient will be taking at home. Be sure to include prescriptions, over the counter and herbal medications. Reconcile with medications received in hospital. List the reason for the medication and dosing in clear non-abbreviated terms.

| Home Medication | Dose | Route | Frequency | Times | Reason for Medication |
|---|---|---|---|---|---|
| Zyprexa | 15mg | PO | bedtime | | mood |
| Depakote ER | 500mg | PO | 2x/day | | mood |
| Wellbutrin SR | 150mg | PO | everyday-daily | | Antidepressant |
| Zyprexa | 10mg | PO | Morning | | mood |
| Trazodone | 50mg | PO | bedtime | | sleep |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**STOP** STOP TAKING THE MEDICATIONS BELOW

| Medication | Dose | Frequency | Route | Reason |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Nurse Signature: _____ Date: 11/7/20?? Time: 1000

Physician Signature: _____ Date: _____ Time: _____

Patient Signature: _____ Date: 11/7/20?? Time: 1000

**DISCHARGE MEDICATION RECONCILIATION FORM**
San Antonio Behavioral Healthcare Hospital

Patient Label

SABHHS.C04
Page 1 of 1

revised 02.28.15

Name: Madison, Joshua
Adnum: 2010884  DOB: 05/24/88  Age: 32
MedRec#: 0120761  Sex: M  DOA: 10/24/20
Unit: A-Alamo
Doctor:    Gonzales-Sanchez, E.

Department of Health & Human Services
Centers for Medicare & Medicaid Services
OMB Approval No. 0938-0692

Patient Name:
Patient ID Number:
Physician:

## An Important Message From Medicare About Your Rights

### As A Hospital Inpatient, You Have The Right To:

- Receive Medicare covered services. This includes medically necessary hospital services and services you may need after you are discharged, if ordered by your doctor. You have a right to know about these services, who will pay for them, and where you can get them.

- Be involved in any decisions about your hospital stay, and know who will pay for it.

- Report any concerns you have about the quality of care you receive to the following Quality Improvement Organization (QIO):

TMF Health Quality Institute
800-725-8315

### Your Medicare Discharge Rights

**Planning For Your Discharge:** During your hospital stay, the hospital staff will be working with you to prepare for your safe discharge and arrange for services you may need after you leave the hospital. When you no longer need inpatient hospital care, your doctor or the hospital staff will inform you of your planned discharge date.

If you think you are being discharged too soon:

- You can talk to the hospital staff, your doctor and your managed care plan (if you belong to one) about your concerns.

- You also have the right to an appeal, that is, a review of your case by a Quality Improvement Organization (QIO). The QIO is an outside reviewer hired by Medicare to look at your case to decide whether you are ready to leave the hospital.

  ☐ If you want to appeal, you must contact the QIO no later than your planned discharge date and before you leave the hospital.

  ☐ If you do this, you will not have to pay for the services you receive during the appeal (except for charges like copays and deductibles).

- If you do not appeal but decide to stay in the hospital past your planned discharge date, you may have to pay for any services you receive after that date.

- Step by step instructions for calling the QIO and filing an appeal are on page 2.

To speak with someone at the hospital about this notice, call:

*Office of the Patient Advocate at extension. 5340 (from a hospital phone) or
210-541-5340 (from an outside phone)*

Please sign and date here to show you received this notice and understand your rights.

| Signature of Patient or Representative | Date/Time  |
|---|---|
| | 11/17/2022   0937 |

$\overline{\text{3-MBHI 1.0G4}}$     1 of 2                                    Form CMS-R-193-3P (Exp. 4/31/2020)

Name: Madson, Joshua
Acct. #: 291923  DOB: 1921-08   Age: 32
Verifier: 0126763  Time 11:1701  1921-96
Unit A: Madsurh
Doctor:        Gonzalez-Sanchez, L

**Steps To Appeal Your Discharge**

- Step 1: You must contact the QIO no later than your planned discharge date and before you leave the hospital. If you do this, you will not have to pay for the services you receive during the appeal (except for charges like copays and deductibles).

  □  Here is the contact information for the QIO:

    *TMF Health Quality Institute*
    *800-725-8315*

  □  You can file a request for an appeal any day of the week. Once you speak to someone or leave a message, your appeal has begun.

  □  Ask the hospital if you need help contacting the QIO.

  □  The name of this hospital is:

    *San Antonio Behavioral Healthcare Hospital*

- Step 2: You will receive a detailed notice from the hospital or your Medicare Advantage or other Medicare managed care plan (if you belong to one) that explains the reasons they think you are ready to be discharged.

- Step 3: The QIO will ask for your opinion. You or your representative need to be available to speak with the QIO, if requested. You or your representative may give the QIO a written statement, but you are not required to do so.

- Step 4: The QIO will review your medical records and other important information about your case.

- Step 5: The QIO will notify you of its decision within 1 day after it receives all necessary information.

  □  If the QIO finds that you are not ready to be discharged, Medicare will continue to cover your hospital services.

  □  If the QIO finds you are ready to be discharged, Medicare will continue to cover your services until noon of the day after the QIO notifies you of its decision.

**If You Miss The Deadline To Appeal, You Have Other Appeal Rights:**

- You can still ask the QIO or your plan (if you belong to one) for a review of your case:

  □  If you have Original Medicare: Call the QIO listed above.
  □  If you belong to a Medicare Advantage Plan or other Medicare managed care plan: Call your plan.

- If you stay in the hospital, the hospital may charge you for any services you receive after your planned discharge date.

For more information, call 1-800-MEDICARE (1-800-633-4227), or TTY: 1-877-486-2048.
CMS does not discriminate in its programs and activities. To request this publication in an alternate format, please call 1-800-MEDICARE or email: AltFormatRequest@cms.hhs.gov .

**Additional Information:**

_[signature]_                    11/17/2020
                                 0434

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. That valid OMB control number for this information collection is 0938-0692. The time required to complete this information collection is estimated to average 15 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.

Form CMS-R-193/SP (Exp 03/30/2010)

Name: Madoux, Joshua
Admit#: 2010064  DOB: 09/24/88  Age: 32
MedRec#: 0120761  Sex: M  DOA: 10/24/20
Unit: A-Monarch
Under:    Gonzalez-Banuloz, E.

## SAN ANTONIO BEHAVIORAL
### HEALTHCARE HOSPITAL

8550 Huebner Rd
San Antonio Texas78240
Phone: 210-541-5300
Fax: 210-592-7349

November 17, 2020,

To whom it may concern:

Please let this letter serve as medical verification for Madson, Joshua. The patient was inpatient in our facility with an admission date of October 24, 2020 under the medical care of Dr. Gonzales-Sanchez, Edulfo.

Any questions or concerns please contact the patient and make sure there is a release of information in place with the patient's signature for additional information.

Sincerely,

Dustin Castillo, C.M.

# Exhibit 6

**Sent:** Friday, September 11, 2020 1:27 PM
**To:** Jeffrey Gall <jeff.gall@validusresearch.com>
**Subject:** 100k Simulation (Item 1 deliverable)

Hi Jeff-

Just wanted to provide you with the supporting evidence for the 10k simulation vs 100k simulation in valcrop_1 for the crop:

### 100k simulation (mpci industry, valcrop_11)

| total_premium_amount | total_ret_prem | sim_loss | total_uwg | loss_ratio | net_loss_ratio | id | return_period |
|---|---|---|---|---|---|---|---|
| $8,918,449,810 | $7,629,005,688 | $20,609,185,272 | -$1,856,190,607 | 231.08% | 124.33% | 200 | 500 Year |
| $8,918,449,810 | $7,629,005,688 | $18,360,532,747 | -$1,590,258,814 | 205.87% | 120.84% | 400 | 250 Year |
| $8,918,449,810 | $7,629,005,688 | $15,811,707,320 | -$1,187,732,541 | 177.29% | 115.57% | 1000 | 100 Year |
| $8,918,449,810 | $7,629,005,688 | $13,905,137,702 | -$811,744,755 | 155.91% | 110.64% | 2000 | 50 Year |
| $8,918,449,810 | $7,629,005,688 | $12,187,745,346 | -$360,375,990 | 136.66% | 104.72% | 4000 | 25 Year |
| $8,918,449,810 | $7,629,005,688 | $10,174,577,741 | $314,401,347 | 114.08% | 95.88% | 10000 | 10 Year |
| $8,918,449,810 | $7,629,005,688 | $8,726,441,331 | $882,861,390 | 97.85% | 88.43% | 20000 | 5 Year |
| 999 | 999 | 999 | 999 | 81.04% | 80.27% | 200099 | Mean |
| 999 | 999 | 999 | 999 | 27.44% | 11.16% | 2000999 | Std Dev |

### 10k simulation (mpci industry, valcrop_1)

| total_premium_amount | total_ret_prem | sim_loss | total_uwg | loss_ratio | net_loss_ratio | id | return_period |
|---|---|---|---|---|---|---|---|
| $8,918,449,810 | $7,629,005,688 | $20,585,563,402 | -$1,903,989,410 | 230.82% | 124.96% | 20 | 500 Year |
| $8,918,449,810 | $7,629,005,688 | $18,149,426,040 | -$1,537,646,798 | 203.50% | 120.16% | 40 | 250 Year |
| $8,918,449,810 | $7,629,005,688 | $15,485,579,499 | -$1,141,579,086 | 173.64% | 114.96% | 100 | 100 Year |
| $8,918,449,810 | $7,629,005,688 | $13,836,896,036 | -$791,961,404 | 155.15% | 110.38% | 200 | 50 Year |
| $8,918,449,810 | $7,629,005,688 | $12,262,598,758 | -$414,158,065 | 137.50% | 105.43% | 400 | 25 Year |
| $8,918,449,810 | $7,629,005,688 | $10,202,686,954 | $304,664,461 | 114.40% | 96.01% | 1000 | 10 Year |
| $8,918,449,810 | $7,629,005,688 | $8,778,930,960 | $873,824,270 | 98.44% | 88.55% | 2000 | 5 Year |
| 999 | 999 | 999 | 999 | 81.08% | 80.29% | 200099 | Mean |
| 999 | 999 | 999 | 999 | 27.29% | 11.20% | 2000999 | Std Dev |

This is true of all three books of business (industry, mpci, and hail) but just for comparison you can see the differences above.

Best Regards,
Josh

Joshua Madson

**From:** Jeffrey Gall <jeff.gall@validusresearch.com>
**Sent:** Friday, September 11, 2020 12:36 PM
**To:** Josh Madson <Josh.Madson@validusresearch.com>
**Subject:** RE: 100k Simulation (Item 1 deliverable)

Josh,

Thank you for sending this through.  However, this is not what I am expecting.  I am expecting something like that described in item 1 of project 1 in the attached email chain.

Jeff

Hi Jeff,

I did prepare for that as well, please see below for the ELT before non-proportional reduction in volatility from the feds/SRA.

| | state_abbreviation | state_group | tsm_year | ret_prem_wr | ret_prem_com | loss_ratio | gr_assigned_risk | gr_commercial |
|---|---|---|---|---|---|---|---|---|
| 1 | AL | 2 | 1 | 2314916.74947959 | 46938833.252602 | 0.514623344039347 | 0.836557749756457 | 0.432196771805... |
| 2 | AL | 2 | 2 | 2314916.74947959 | 46938833.252602 | 0.612450395200482 | 0.996549296880751 | 0.514342041358... |
| 3 | AL | 2 | 3 | 2314916.74947959 | 46938833.252602 | 0.564404431870214 | 1.572429324027 | 0.809943071238... |
| 4 | AL | 2 | 4 | 2314916.74947959 | 46938833.252602 | 0.913342902190898 | 1.40912797812939 | 0.767036845251... |
| 5 | AL | 2 | 5 | 2314916.74947959 | 46938833.252602 | 0.775934427283489 | 1.26509609640668 | 0.65163861058... |
| 6 | AL | 2 | 6 | 2314916.74947959 | 46938833.252602 | 0.625839993409216 | 1.02037838835669 | 0.52556758755... |
| 7 | AL | 2 | 7 | 2314916.74947959 | 46938833.252602 | 1.17180068491237 | 1.91053339653875 | 0.98409782119... |
| 8 | AL | 2 | 8 | 2314916.74947959 | 46938833.252602 | 0.766649798205312 | 1.23065314041024 | 0.635443135223... |
| 9 | AL | 2 | 9 | 2314916.74947959 | 46938833.252602 | 1.03038476197679 | 1.63929860477323 | 0.872047404671 |
| 10 | AL | 2 | 10 | 2314916.74947959 | 46938833.252602 | 0.589762695702597 | 0.961557920642894 | 0.49528946012... |
| 11 | AL | 2 | 11 | 2314916.74947959 | 46938833.252602 | 2.07846895425447 | 3.38876937126325 | 1.74552204396... |
| 12 | AL | 2 | 12 | 2314916.74947959 | 46938833.252602 | 0.664458742180571 | 1.08355327331459 | 0.55812512136... |
| 13 | AL | 2 | 13 | 2314916.74947959 | 46938833.252602 | 0.836400296087717 | 1.36368279916205 | 0.70242021054... |
| 14 | AL | 2 | 14 | 2314916.74947959 | 46938833.252602 | 0.720257993052719 | 1.17431940656104 | 0.60488090468... |
| 15 | AL | 2 | 15 | 2314916.74947959 | 46938833.252602 | 0.257043544851418 | 0.420391972261618 | 0.21653395930... |
| 16 | AL | 2 | 16 | 2314916.74947959 | 46938833.252602 | 0.383898551882139 | 0.625913941212325 | 0.32248029965... |
| 17 | AL | 2 | 17 | 2314916.74947959 | 46938833.252602 | 1.26582788486106 | 2.06382471729952 | 1.06305674176... |
| 18 | AL | 2 | 18 | 2314916.74947959 | 46938833.252602 | 1.36697625230038 | 2.21243437893879 | 1.13960418363... |

Hope that is enough for now but understand if you would like to see something else before I review with Tomasz... just let me know.

Regards,
Josh

Josh Madson
Validus Research
Vice President
500 W Madison St. Chicago IL, 60661
Tel +1 312 930 2576 | Mob +1 312 785 6033
josh.madson@validusresearch.com

**Exhibit 7**

Reply   Reply All   Forward   IM



Tue 8/24/2021 2:38 PM

John Raeihle

RE: Crop

To   Josh Madson

Josh,

We are converting from a power point to keeping in excel.
But may be helpful to have a couple of bullet points in the excel.

Thanks.

**From:** Josh Madson <Josh.Madson@validusresearch.com>
**Sent:** Tuesday, August 24, 2021 3:36 PM
**To:** John Raeihle <J.Raeihle@westernworld.com>
**Subject:** Re: Crop

No problem, let me take a look this afternoon.

Sent from my iPhone

> On Aug 24, 2021, at 8:53 AM, John Raeihle <J.Raeihle@westernworld.com> wrote:

Josh,

I am putting together a power point presentation for the meeting on Thursday with Melissa.

I am hoping that you can help me add some bullet points to explain the various methods that you use.

The excel is what I hope to add as an appendix to the attached powerpoint.

<Crop ppt with exhibit As.pdf>
<Apprendix.xlsx>

Reply  Reply All  Forward  IM



Tue 8/24/2021 4:37 PM

John Raeihle

RE: Updated Crop

To    Verheyen, Mark

Cc    Josh Madson

You replied to this message on 8/24/2021 4:59 PM.

Josh has pointed out an issue.   We are looking into it.   He is also working on adding bulllets on the excel files.

**From:** Verheyen, Mark <Mark.Verheyen@aig.com>
**Sent:** Tuesday, August 24, 2021 5:33 PM
**To:** John Raeihle <J.Raeihle@westernworld.com>
**Cc:** Josh Madson <Josh.Madson@validusresearch.com>
**Subject:** RE: Updated Crop

Thanks, John.  Looks good.  Go ahead and send to Melissa and any other meeting attendees if you're good with it.

Mark Verheyen

Tel +1 617 457 2767 | Cell + 1 347 514 1487

mark.verheyen@aig.com

Reply    Reply All    Forward    IM



Tue 8/24/2021 6:09 PM

John Raeihle

Crop

To    Dawn Schuster; Josh Madson

 Crop--Summary_exA-Appendix_v2.xlsx      2022 Plan Summary Crop_v6.pptx
190 KB                                                3 MB

I am going to send this over to Melissa in the next 20 minutes or so as need to head out
for a couple of hours.

Dawn,

I have changed the wording under the Commercial Fund to eliminate the wording around
the 35% to state that CRS retains 100%.

I also added wording around the premiums on the first 2 slides.  I don't remember if this in
what I sent earlier.

I also added a bullet on the first slide about AIG research work on loss ratios.

Josh,  I pulled in your notes on the 6 tabs.
        And updated the one MPCI spreadsheet.



⟲ Reply   ⟲ Reply All   ⟲ Forward   💬 IM

Tue 8/24/2021 6:30 PM

John Raeihle

Crop Plan Loss Ratios

To      Mcdermott, Melissa

Cc      Verheyen, Mark; ▦ Josh Madson                                                      ⌃

 Crop--Summary_exA-Appendix_v2.xlsx  ▾    2022 Plan Summary Crop_v6.pptx  ▾
190 KB                                              3 MB

Melissa,

Attached is a power point presentation and an excel spreadsheet for the Crop plan loss ratios.

The Excel contains the summary spreadsheet, Ex A for Crop MPCI, Ex A for Crop Private Products, and Appendix which includes the indications developed by Josh.

The power point includes 3 slides that cover the summary as well as slides covering the MPCI SRA (Standard Reinsurance Agreement).



Reply   Reply All   Forward   IM

Tue 8/24/2021 9:53 AM

John Raeihle

Crop

To    Josh Madson

You replied to this message on 8/24/2021 2:36 PM.

Crop ppt with exhibit As.pdf
232 KB

Apprendix.xlsx
1 MB

Josh,

I am putting together a power point presentation for the meeting on Thursday with Melissa.

I am hoping that you can help me add some bullet points to explain the various methods that you use.

The excel is what I hope to add as an appendix to the attached powerpoint.

**Exhibit 8**



Sun 9/13/2020 10:12 AM
Kelly Gulick
RE: Premium info

To    Shawn Simpsen; Josh Madson

If you are talking about finding the difference in premium between to incorrectly rated policies vs the corrected policies, no there is no way I'll have it done by Monday. I am also waiting on Todd Janes to send me the request back about the Nebraska Production Wind + Extension average rate info. I sent the 3 problems that Iowa had to Josh. He doesn't think there is much wiggle room between what our filed rates were vs what the minimum they have to be to meet the mandatory 15% within NCIS rating tolerance. So I'm assuming all IA policies will have to be recalculated and new bills sent out? If so I would like to work on those policies 1st Monday since billing will be on Tuesday.

Kelly Gulick | Tel + 1 217 619 7856 | Kelly.Gulick@CropRiskServices.com

-----Original Message-----
From: Shawn Simpsen <Shawn.Simpsen@cropriskservices.com>
Sent: Saturday, September 12, 2020 1:10 PM
To: Kelly Gulick <Kelly.Gulick@cropriskservices.com>; Josh Madson
<Josh.Madson@validusresearch.com>
Subject: Premium info

Kelly and Josh
Do you think you would have that premium info by Monday?

Shawn

Sent from my iPhone



Mon 9/14/2020 9:20 AM

Kelly Gulick

RE: Nebraska rating issue

To     Shawn Simpsen;   Josh Madson;   Douglas Neibuhr;   Roger Ninness;   Joni Zimmerman

The question he is referring to is not rating the extra harvest with the 15% extension rate like we do all other states.

Kelly Gulick | Tel + 1 217 619 7856 | Kelly.Gulick@CropRiskServices.com

-----Original Message-----
From: Shawn Simpsen <Shawn.Simpsen@cropriskservices.com>
Sent: Monday, September 14, 2020 10:09 AM
To: Josh Madson <Josh.Madson@validusresearch.com>; Douglas Neibuhr <Doug.Neibuhr@cropriskservices.com>; Roger Ninness <Roger.Ninness@cropriskservices.com>; Joni Zimmerman <Joni.Zimmerman@cropriskservices.com>
Cc: Kelly Gulick <Kelly.Gulick@cropriskservices.com>
Subject: Nebraska rating issue

Team,
Kelly had sent out a question on if we can rate wind in Nebraska the same way we do other states. I was told Geoff, Dustin and Josh worked on this? Josh can you shed any light on this? Is there a reason we do it that way in Neb? Need an answer today?

Shawn

Sent from my iPad

**Exhibit 9**



Reply    Reply All    Forward    IM

Sun 8/29/2021 4:00 PM

Mcdermott, Melissa <Melissa.Mcdermott@aig.com

RE: LR Planning: Crop w/ Melissa

To     Verheyen, Mark;   John Raeihle

Cc     Josh Madson

John and Josh-

Great job on the budget loss ratio walk for Crops.  I appreciate you explaining all the details of crop to me yet again.  😊

Melissa McDermott
Tel +1 212 458 1340 | Cell +1 347 899 0787 | Fax +1 203 583 4736

-----Original Appointment-----
**From:** Shy, Christina **On Behalf Of** Mcdermott, Melissa
**Sent:** Thursday, August 12, 2021 5:47 PM
**To:** Mcdermott, Melissa; Verheyen, Mark; Raeihle,John
**Cc:** Josh Madson
**Subject:** LR Planning: Crop w/ Melissa
**When:** Thursday, August 26, 2021 10:30 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
aig@m.webex.com
Video Conference ID: 118 130 664 5
Alternate VTC instructions

## Exhibit 10



-----Original Message-----
From: Dawn Schuster <Dawn.Schuster@cropriskservices.com>
Sent: Friday, September 4, 2020 7:41 AM
To: Steve Maulberger <Steve.Maulberger@cropriskservices.com>; Brian Young <Brian.Young@cropriskservices.com>; Josh Madson <Josh.Madson@validusresearch.com>
Subject: RE: Budget

Thanks Steve.  Will keep that in mind.

-----Original Message-----
From: Steve Maulberger <Steve.Maulberger@cropriskservices.com>
Sent: Friday, September 4, 2020 7:30 AM
To: Dawn Schuster <Dawn.Schuster@cropriskservices.com>; Brian Young <Brian.Young@cropriskservices.com>; Josh Madson <Josh.Madson@validusresearch.com>
Cc: Steve Maulberger <Steve.Maulberger@cropriskservices.com>
Subject: Budget

Dawn

I don't know what date you have to turn in the budget but next week Sept 11 there is a USDA Report coming out that will be taking into account the production issues. The loss of the top end of this crop from lack of rain, the Iowa derecho and the hurricane that hit the USA.

Some traders think the changes in corn and beans could be significant and move the market in a bullish way. This means prices for this year and 2021 could be impactful.

Just a heads up to keep the final calcs open if you can.

All the best
Steve

Sent from my iPhone

**Exhibit 11**



Food for thought——need to talk with Dustin——but my suggestions is that Josh uses the same GS/W/EH rate form in NE that he used in IA, MN——it's clean, easy to read, has rates adjusted to NCIS CRD FALCS & also gives the rate for NOV. 1st when they choose the EXT

Doug Neibuhr
Crop Risk Services
New Product Manager

132 S. Water
Suite 500
Decatur, IL 62523
Tel 217-619-7878 | Mob 217-620-4184

doug.neibuhr@cropriskservices.com | cropriskservices.com

Replies:
Doug Neibuhr | Tel 217-619-7878 | doug.neibuhr@cropriskservices.com

-----Original Message-----
From: Kelly Gulick <Kelly.Gulick@cropriskservices.com>
Sent: Monday, September 14, 2020 10:47 AM
To: Josh Madson <Josh.Madson@validusresearch.com>; Shawn Simpsen <Shawn.Simpsen@cropriskservices.com>; Douglas Neibuhr <Doug.Neibuhr@cropriskservices.com>; Roger Ninness <Roger.Ninness@cropriskservices.com>; Joni Zimmerman <Joni.Zimmerman@cropriskservices.com>
Subject: RE: Nebraska rating issue

In every other state where we offer wind, extra harvest, and the 2 week extension and the insured elects all 3 options we have always added the wind and extra harvest rate and then multiplied that gross rate by 15% (the 2 week extension rate). For Nebraska in 2020 it look like we are only applying the 15% to the wind portion and not the extra harvest portion based on what I see on the Limits and Rates page (attached).

Kelly Gulick | Tel + 1 217 619 7856 | Kelly.Gulick@CropRiskServices.com

## Exhibit 12

⟨ Reply   ⟨ Reply All   ⟨ Forward   ⟨ IM

Mon 8/30/2021 11:46 AM

### Colleen Sizemore

### RE: Product Development Table Update

To   Josh Madson

Cc   Timothy Yeakley;   Praveena Pepalla

It sounds like this can be completed by mid-week.

---

**From:** Josh Madson <Josh.Madson@validusresearch.com>
**Sent:** Monday, August 30, 2021 11:44 AM
**To:** Colleen Sizemore <Colleen.Sizemore@CropRiskServices.com>
**Cc:** Timothy Yeakley <Tim.Yeakley@cropriskservices.com>; Praveena Pepalla <Praveena.Pepalla@CropRiskServices.com>
**Subject:** RE: Product Development Table Update

No, Colleen...I have not spoken with Jay about that. Tim was guessing that we might be able to get it completed mid-week but it seems like that is tough.

Why don't you ask Praveena when this will be finalized since she is the one working on this and I have a deadline to meet by EOW.

Thanks.
Josh

Josh Madson
Validus Research
Vice President
500 W Madison St. Chicago IL, 60661
Tel +1 312 930 2576 | Mob +1 312 785 6033
josh.madson@validusresearch.com



Reply  Reply All  Forward  IM



Mon 8/30/2021 12:04 PM

## Colleen Sizemore

### Re: Product Development Table Update

To      Josh Madson

Cc      Timothy Yeakley; Praveena Pepalla

Josh,

I think I misunderstood some of the timelines for this ask so originally was not scheduling this out yet however we should be able to remedy that.

Can you get me a timeline of your deadlines moving forward so I can make sure we are prioritizing appropriately?

Thank you,
Colleen

> On Aug 30, 2021, at 11:44 AM, Josh Madson
> <Josh.Madson@validusresearch.com> wrote:
>
> No, Colleen...I have not spoken with Jay about that.  Tim was guessing that we
> might be able to get it completed mid-week but it seems like that is tough.
>
> Why don't you ask Praveena when this will be finalized since she is the one
> working on this and I have a deadline to meet by EOW.
>
> Thanks.
> Josh
>
> Josh Madson
> Validus Research
> Vice President
> 500 W Madison St. Chicago IL, 60661
> Tel +1 312 930 2576 | Mob +1 312 785 6033
> josh.madson@validusresearch.com

**Exhibit 13**

 **AIG**

**2021 Year-End Performance
Conversation Summary**

**Employee:**  Madson, Joshua (5314022)                          **Date of Conversation:** _____
**Reviewing Manager:**  Miller, Jason (5299740)                  **Report Run:** 01/27/22

**INSTRUCTIONS:** Please use this guide for your Year-End Performance Review Conversation. Space is provided throughout the report for any notes you may take during the conversation.

# Section I: Goals

## GOAL 1

| | |
|---|---|
| **TITLE:** | Analytical Thought Leadership in Agriculture |
| **WEIGHT:** | 25 |
| **DESCRIPTION:** | Valcrop Roadmap- Portfolio Optimizaton: Identify how crop hail and private products fit into portfolio optimization for the crop portfolio- Distribution Fitting: Develop a distribution fitting routine to allow the chosen parametric distribution to vary in Valcrop 1.0.0-Fund Designation: Develop an algorithm and utilize parameters from Valcrop 1.0.0 to assign fund designation outcomes to crop insurance policies from the CRS book of business- Return on Commission Analysis: identify agencies generating the most lift for CRS in terms of expected underwriting gain- Crop Hail Model: Development of a stochastic model for crop hail insurance based on historical underwriting and meteorological data- Yield and Price Database: incorporating crop yields by county and commodity prices to develop rates for add-on products for CRS or a variety of different instances (loss outcomes in drought years, etc.) Can also be used for future work geared toward developing a ground-up model for MPCI Risk- Rate Adequacy Studies: continue to discuss approach on HIP-Wi with Jeff Gall to deliver refined view to CRS/Brian Young- Contextualizing Ag Risk in Regions Outside the United States: China, India, Latin America, with guidance from Peter Griffin |
| **SELF EVALUTION:** | Partially Met |
| **SELF COMMENTS:** | *The current priority is the Crop Hail model. All other projects continue to present opportunities for strategic development of analytic capabilities at CRS/Validus/AIG with respect to Agriculture and other applicable lines of business.* |

## GOAL 2

| | |
|---|---|
| **TITLE:** | Core Projects from 2020 |
| **WEIGHT:** | 25 |
| **DESCRIPTION:** | - MPCI Treaty Model Correlation Matrix -- complete related matrix, corresponding documentation/validation, and reproducibility of product- Valcrop 1.0.0 - documentation/validation and reproducibility of product |
| **SELF EVALUTION:** | Fully Met |
| **SELF COMMENTS:** | *Completed as Requested. Documentation in LaTex.* |

## GOAL 3

| | |
|---|---|
| **TITLE:** | Performance Management Items |
| **WEIGHT:** | 25 |
| **DESCRIPTION:** | - Demonstrate a more proactive approach on key projects- Communication: keeping managers and peers in the loop on requests/asks coming from the business, including CRS; being forthright and open during catch up conversations; detailed documentation/validation work (code, data, papers). Enhancing the effectiveness of presentations and documentation for stakeholders and peers.-Deliverables: provide better evidence of what is being delivered to CRS. Further, the work product should be communicated, defined, and allow time for Research to review before going back to the business. |
| **SELF EVALUTION:** | Fully Met |
| **SELF COMMENTS:** | *Communication has improved dramatically. Deliverables provided on time as Requested. Continued dialogue with CRS on fund designation special projects.* |

## GOAL 4

| | |
|---|---|
| **TITLE:** | Validus Research Strategic Goals and Initiatives |
| **WEIGHT:** | 25 |
| **DESCRIPTION:** | Maintain the focus and consistent effort of your team towards all Validus Research Strategic Goals. Drive team efforts to fully deliver Validus Research Strategic Initiatives, and ensure the careful and efficient execution of Validus Research Operational Imperatives |
| **SELF EVALUTION:** | Fully Met |
| **SELF COMMENTS:** | *Continuous effort showcased in pushing towards the Validus Research Strategic Goals. I work to ensure careful/efficient execution of all Validus Research Operational Imperatives highlighted by Jeff and Jason* |

## ADDITIONAL QUESTIONS

**What was your proudest achievement and biggest disappointment in the past year?**

**SELF COMMENTS:** *My proudest achievement was replicating Kai's previous work on principal components analysis in development of a thoughtful correlation structure for the MPCI treaty reinsurance model.*

*My biggest disappointment in the past year was surfacing the issue associated with Crop Hail model development (quality vs quantity of data from an underwriting/business perspective) and then having to make corrections in the development of the final project.*

## MANAGER FEEDBACK ON GOAL PERFORMANCE

**Overall, how would you evaluate the performance of Joshua Madson on their goals?**

**MANAGER EVALUATION:** PARTIALLY MET

**Overall Performance for Joshua Madson**

**MANAGER COMMENTS:**

*Josh worked with both myself and Jeff Gall as supervisors in 2021 and feel Josh improved his performance in 2021 relative to concerns noted in 2020. Josh, Jeff and I had weekly meetings to go over current works during the week, projects from CRS, and planning for larger projects. This frequency of communication enhanced the support of Josh in his efforts to build out the agriculture research practice within Validus Research.*

*We worked through enhancements to ValCrop 1.0 this year and spent considerable time on the documentation around this, assuring Josh's work was to the expected standard for required documentation. The correlation matrix for the MPCI treaty model was completed and produced for review by the actuarial team. Josh was able to replicate Kai's previous work on principal components analysis related to the MPCI treaty reinsurance model. Both were validated internally.*

*Areas we will continue to work through with Josh include proactive communication, project plans and related deadlines, and agricultural model building suitable for reproduction of results, validation of the model, and related documentation. Specifically with respect to communication, we will continue to reinforce proactive communication of the status key projects and clarity from Jeff and myself to review works and provide feedback. Like the first half of the year, I'd like to see some of the requests coming in from CRS, even if it is just forwarded emails when a new project request comes in and milestones along the way. We specifically have asked that the work product should be communicated, defined, and allow time for Research to review before going back to the business. With respect to regroups, I would like to hear more dialogue from Josh to expand upon project successes and challenges. We've work with Josh on effectiveness of presentations and documentation for stakeholders and peers - he has been receptive to feedback in most cases and will continue to discuss.*

**Conversation Notes:**

# Section II: Behaviors

**BEHAVIORS THAT MATTER**

| Behavior | Super Factor | Self | From Manager |
|---|---|---|---|
| admits and learns from mistakes | Learning Agility | Fits Perfectly | In-between |
| anticipates and solves problems | Problem Solving | Fits Perfectly | In-between |
| applies the right level of detail | Problem Solving | Fits Perfectly | In-between |
| collaborative and helpful | General | Fits Perfectly | In-between |

| | | | |
|---|---|---|---|
| considers suggestions from others | Fosters Open Communication | In-between | Fits Poorly |
| dedicated to meeting client's needs | Customer Focus | Fits Perfectly | Fits Perfectly |
| demonstrates business/industry knowledge | Business/Industry Knowledge | Fits Perfectly | Fits Perfectly |
| energetic and engaged | General | Fits Perfectly | In-between |
| focuses on what matters most | Drive for Results | In-between | In-between |
| gets things done in the organization | Drive for Results | Fits Perfectly | Fits Perfectly |
| good at building relationships | Builds Strategic Relationships | Fits Perfectly | Fits Perfectly |
| open to new ways of doing things | Learning Agility | Fits Perfectly | Fits Poorly |
| reliable in meeting commitments | Drive for Results | Fits Perfectly | In-between |
| remains focused in stressful situations | General | Fits Perfectly | Fits Perfectly |
| source of many good ideas | Drive Innovation | Fits Perfectly | In-between |
| thoughtful and decisive | Decision Quality / Risk Mindset | Fits Perfectly | Fits Perfectly |
| values diversity of people and places | General | Fits Perfectly | Fits Perfectly |
| clear and articulate | Fosters Open Communication | Fits Perfectly | In-between |
| proactive in sharing updates and relevant information | Fosters Open Communication | Fits Perfectly | In-between |

| trusted and respected by clients | Customer Focus | Fits Perfectly | Fits Perfectly |
|---|---|---|---|

## STRENGTHS

| Strengths (Self) | Strengths (from Manager) |
|---|---|
| gets things done in the organization | dedicated to meeting client's needs |
| source of many good ideas | demonstrates business/industry knowledge |
| trusted and respected by clients | trusted and respected by clients |

## WEAKNESSES & IMPACT

| Weaknesses/Impact (Self) | Weaknesses/Impact (from Manager) |
|---|---|
| considers suggestions from others (Substantial) | clear and articulate (Moderate) |
| focuses on what matters most (Moderate) | considers suggestions from others (Substantial) |
| values diversity of people and places (Mild) | open to new ways of doing things (Mild) |

**Conversation Notes:**

## ADDITIONAL QUESTIONS

**Please use the comments box below to add any comments relating to your strengths and weaknesses (the 'how') for past year?**

SELF COMMENTS:    *A lot of opportunity for development of strategically relevant analytical tools at CRS/Validus/ AIG*

**Please describe the most important thing that Joshua Madson could do to improve their performance.**

MANAGER COMMENTS:    *With respect to communication, we will continue to reinforce proactive communication of the status key projects and clarity from Jeff and myself to review works and provide feedback.*

**Exhibit 14**



Josh Madson likes this

Josh Madson
Vice President- Research Scientist at Various
3mo · ⊕

#sas

⟵    **Activity**

Private to you

Followers (753)                                    ⟩

[All activity]  Articles   Posts   Documents

Josh Madson                                        ⋮
Vice President- Research Scientist at Various
now · ⊕

may no one ever die alone
#fuckmylife

⟨  ○  Mark Madson                    ⋮

Josh - you on the road
somewhere?  Is the text
from Lara regarding last
October?

No, I am not on the road
somewhere.

The text is regarding what
happened last October.

However, I have no evidence
that would indicate whether
it is the truth or a lie.

You are the gaslighter, my
son.

Goodbye.

👍 Like        💬 Comment        ↗ Share        ✈ Send

📊 1,611 impressions                              View analytics

# Important: Joshua Madson    AIG Termination x    

 **Joers, Rick** <Richard.Joers@aig.com>    Tue, Feb 22, 2022, 3:39 PM    ☆    ↩    ⋮
to me, Brenda ▾

Josh,

Please see attached letter for important information concerning your employment.

Rick Joers

**Richard Joers**
Pronouns: He/Him/His
Head of Employee Relaltions
GLCR
American International Group (AIG)

Remote FL
T (+1) 718.250.1870 | C (+1) 718.612.0082 Cell +1 718 612 0082
richard.joers@aig.com | www.aig.com



**richard.joers@aig.com| www.aig.com**

IMPORTANT NOTICE:
The information in this email (and any attachments hereto) is confidential and may be protected by legal privileges and work product immunities. If you are not the intended recipient, you must not use or disseminate the information. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by American International Group, Inc. or its subsidiaries or affiliates either jointly or severally, for any loss or damage arising in any way from its use.



American International
Group, Inc.
Employee Relations
1671 Avenue of the Americas
New York, NY 10020
1-800-265-5054

February 22, 2022

Joshua Madson
1680 S. Ridge Road
Lake Forest, IL 60045

Dear Joshua Madson:

As noted in our letter of February 17th, you have been absent from work since February 14, 2022.  Because your absence has not been approved and you have not contacted your manager or management team, we have determined that you have abandoned your position with the organization. As noted in that letter, our policy on job abandonment is absence without management notification in excess of three (3) consecutive days.

We originally indicated that your employment with Validus America, Inc. would be terminated effective February 21, 2022, due to job abandonment.  We asked, at the time if there were any extenuating circumstances that prevent you from working or notifying us of the reason for your absence to call me, Rick Joers, at phone 718-612-0082.

At this point, we have not heard from you, but have withheld pursuing termination to give you another opportunity to contact me and to seek any assistance that may be required.  At this point we have placed you on an unpaid leave of absence until you have made contact.  As noted in the past, there are other resources available to assist you including the Employee Assistance Program (EAP) at 800-774-6742, and various type of leaves of absence that you can initiate through HRSS at 800-265-5054.  Please contact me before close of business March 4th.

Sincerely,

Richard Joers
Head of Employee Relations
AIG

mail.com - TKO



# TKO

| | |
|---|---|
| **From:** | "Josh Madson" <joshmadson@mail.com> |
| **To:** | jason.miller@validusholdings.com, simon.biggs@validusholdings.com, jeffrey.gall@validusholdings.com |
| **Date:** | Mar 1, 2022 9:17:45 AM |

Jeff,

I'm in New York apartment hunting.

Should be back in Chicago some time

I'll update you as I'm able.  Let me know if any concerns...

Regards,
Josh

## Contact with Validus  ∑  Inbox ×  AIG Termination ×   



**Joers, Rick** <Richard.Joers@aig.com>  Tue, Mar 1, 2022, 12:28 PM  ☆  ↩  ⋮

to me ▾

I have been made aware that you have emailed employees of Validus.  As per my previous emails, it is imperative that you contact me before attempting any other contact internally.  My numbers are below.

Rick

**Richard Joers**
Pronouns: He/Him/His
Head of Employee Relaltions
GLCR
American International Group (AIG)

Remote FL
T (+1) 718.250.1870 | C (+1) 718.612.0082  
richard.joers@aig.com | www.aig.com



**richard.joers@aig.com| www.aig.com**

IMPORTANT NOTICE:
The information in this email (and any attachments hereto) is confidential and may be protected by legal privileges and work product immunities. If you are not the intended recipient, you must not use or disseminate the information. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by American International Group, Inc. or its subsidiaries or affiliates either jointly or severally, for any loss or damage arising in any way from its use.

## Claim to Money Damages: Title 42, Section 1981 of the US Code

**Facts:**

Court notes that plaintiff invokes 42 U.S.C. § 1981 as a basis for his claims yet fails to provide non-conclusory allegations that plausibly suggest that his race was a "but-for" cause for Defendant's actions.  In fact, plaintiff's race is a "but-for" cause for the alleged actions taken against plaintiff in the termination of his employment.  As defined by the Legal Information Institute of the Cornell Law School, the but-for test is a test commonly used in both tort and criminal law to determine actual causation, and asks "but for the existence of X, would Y have occurred?"  In this instance, the question posed to plaintiff is "but for your race (Jewish) would AIG have attempted to affect your assassination, removal from the domestic political and business arena, and have ultimately terminated your employment?  The answer to this question is unequivocally "No".  If not for plaintiff's race, none of the events detailed in plaintiff's claim to money damages under Title VII of the Civil Rights Act of 1964 would have occurred.  One immediate purpose of Molto Publishing's incorporation in New York as a limited liability company as envisioned in the early 2000's was to provide a fail-safe to the Jewish business community in the face of a global and wide-sweeping wave of anti-Semitism.  The actions taken by AIG at the behest of executives Lucy Fato and Peter Zaffino were pre-emptive in nature and an attempt to reverse the political consequences of plaintiff's established business record and ability to bring Molto Publishing to market.

Plaintiff has included evidence (see **Exhibit 15**) of the wide-sweeping and publicly demonstrated anti-Semitism directed toward himself and his recently incorporated company.  The exhibits show individuals including Candy Magee (Farmers Mutual Hail, a domestic insurance and reinsurance company), David Buffo (Dell Inc., a global technology company), Oscar Vergara (Verisk, a global risk modeling company), and Vincent Pomo (Everest Re, a global insurance and reinsurance company) marking plaintiff and his company as Jewish and calling for his elimination from the marketplace in a similitude best described by the literary device "the black spot" employed in Robert Louis Stevenson's "Treasure Island".  It is this evidence, in addition to plaintiff's exceptional decade long track record in the reinsurance marketplace that supports his assertion of his claim to money damages under Title 42 U.S.C. § 1981 in the amount of **USD $50,000,000 (**see **Exhibit 16**).

**Exhibit 15**

**6.4.2023**

 **Candy Magee** likes this

• • •

**Dean Wise** · 2nd
Product Support Manager at CNH Industrial - Southeast R...          + **Follow**
6d · 🌐

What a way to celebrate Memorial Day weekend, with checking off a bucket list item. …see more



 

  **Candy Magee and 66 others**          2 comments · 1 repost

 Like          💬 Comment          ⟲ Repost          ✈ Send

**5.25.2023**



**David Buffo** likes this                                    • • •

**Steve Meyers** · 2nd

Managing Director and Global Account Manager on Accen...     **+ Follow**

2d · 🌐

Dell Technologies World has officially opened! Grateful for the Accenture partnership and their investment to be here this week.

...see more



 David Buffo and 291 others                    6 comments · 2 reposts

 ▼      Like      Comment      Repost      Send

**5.25.2023**



**Oscar Vergara** · 1st
Assistant Vice President – Agricultural Risk Modeling
2h · 🌐

The threat of hail is growing and has unique cumulative effects. In PropertyCasualty360, Verisk experts Arindam Samanta and Tim Greene explore the growing scope of the hail threat—and how insurers can better address all aspects of the risk. Check out the article here: https://vrsk.co/3ourAL1.



propertycasualty360.com · 1 min read
**Severe thunderstorms and hail: A past, present and future risk | PropertyCasualty360**

 1

  Like  Comment  Repost  Send

**5.18.2023**



**Exhibit 16**

**Josh Madson**
|| (224) 813-0011 || 280 E. 2nd St. #3F || Manhattan, NY 10009 || joshmadson@gmail.com ||

<u>Professional Experience</u>

| | |
|---|---|
| **Vice President** | *7/19 – 3/22* |
| *AIG Re* | *Chicago, IL* |

- In house expert on agriculture and weather risk for AIG Re, a leading specialty reinsurance company. Responsible for development of annual budget for Crop Risk Services, a subsidiary company of AIG General Insurance. Developed a stochastic model for use in optimizing risk and return of the agriculture portfolio through the application of the Markowitz mean-variance framework identifying both the global minimum variance and Sharpe ratio maximizing mix of business based on current written premium.

| | |
|---|---|
| **Director** | *3/17 – 7/19* |
| *Aon Reinsurance Solutions* | *Chicago, IL* |
| *Aon Securities Inc.* | |

- Responsible for a team of six quantitative analysts with expertise in (re)insurance, computational econometrics and statistics, software development/engineering, and database management

- Led market making activities including sourcing counterparty capacity from global reinsurance markets on exchange traded weather and US treaty business helping clients transfer over $500 MM in limit and generating ~$1.5MM of revenue annually for the firm

| | |
|---|---|
| **Associate Director** | *3/15 – 3/17* |
| *Aon Reinsurance Solutions* | *Chicago, IL* |
| *Aon Securities Inc.* | |

- Led Aon Securities' efforts to register as a commodity trading advisor, commodity pool operator, introducing broker, and swap firm with the National Futures Association

- Executed swaps transactions on behalf of insurance agents seeking coverage for foregone profit commission in years when insurance carriers were unable to pay generating ~$250k of revenue annually for the firm

- Wrote the source code for Aon's price-yield simulation model for domestic row crop production risk based on simulation of over 20k marginal commodities futures price & yield distributions

| | |
|---|---|
| **Senior Analyst** | *3/14 – 3/15* |
| *Aon Reinsurance Solutions* | *Chicago, IL* |
| *Aon Securities Inc.* | |

- Developed and rated new products for Aon clients including industry loss warranties for insurance agents, parametric coverages for insurance carriers, production shortfall insurance for ethanol producers, and over-the-counter derivatives covering flood, commodity price, and other weather-linked risks

| | |
|---|---|
| **Analyst** | *3/13-3/14* |
| *Aon Reinsurance Solutions* | *Chicago, IL* |

- Financial modeling and ceded economic analysis for treaty reinsurance clients including excess of loss (XOL) and quota share (QS) structures for risk transfer to global reinsurance markets. Application of in-house and vendor models to client portfolios.

<u>Education</u>

| | |
|---|---|
| **North Carolina State University** | *8/10-4/13* |
| PhD ABD - Economics, Minor in Statistics | *Raleigh, NC* |
| Master's Degree- Economics | |

| | |
|---|---|
| **The College of Wooster** | *8/06-5/10* |
| Bachelor's Degree - International Relations, Minor in Mathematics | *Wooster, OH* |



Reusable Envelope



RECEIVED
AUG - 3 20
PRO SE OFFICE

TO REUSE: Mark through all previous shipping labels and barcodes.

ORIGIN ID:UTOA  (224) 813-0011
JOSHUA OLIN MADSON

280 E 2ND ST APT 3F
NEW YORK CITY, NY 10009
UNITED STATES US

SHIP DATE: 01AUG23
ACTWGT: 0.40 LB
CAD: 0993085/SSF02422

BILL CREDIT CARD

TO **PRO SE INTAKE UNIT**

**500 PEARL STREET**

**NEW YORK NY 10007**
(224) 813-0011

REF:
DEPT:

**FedEx**
Express

**E**

TRK# 7819 2290 5292
0201

FRI – 04 AUG 5:00P
EXPRESS SAVER
ASR
10007
NY-US    EWR

**K2 PCTA**



USMP3
SDNY

Align bottom of peel-and-stick airbill or pouch here.